IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Barbara K. Thompson,
et al.,

       Plaintiffs,

       v.                             Case No. 2:10-cv-98

Sunbeam Products, Inc.,
et al.,

       Defendants.


OPINION AND ORDER

This is a product liability action filed by plaintiffs Barbara K. Thompson and her husband, Marlin D. Thompson, against defendants Sunbeam Products, Inc. ("Sunbeam"), Jarden Consumer Solutions, a d/b/a name under which Sunbeam does business, Simatelex Manufacturing Co. ("Simatelex"), and Wal-Mart Stores, Inc. ("Wal-Mart"). The complaint was filed on October 7, 2009, in the Common Pleas Court of Gallia County, Ohio, and was removed to this court on February 3, 2010, based on diversity of citizenship. It is alleged in the complaint that Barbara Thompson was injured while using a hand mixer which was manufactured by Simatelex, a company located in Hong Kong, China, marketed in the United States by Sunbeam, and purchased by Mrs. Thompson at Wal-Mart.

The first five causes of action track the provisions of the Ohio Product Liability Act ("OPLA"), Ohio Rev. Code §§ 2307.71-2307.80. The first through fourth causes of action assert claims against Sunbeam and Simatelex for defective manufacture and/or construction (Ohio Rev. Code §2307.74); defective design and/or formulation (Ohio Rev. Code §2307.75); inadequate warnings (Ohio Rev. Code §2307.76); and nonconformance with manufacture's

representations (Ohio Rev. Code §2307.77).  The fifth cause of action asserts a claim against Wal-Mart for supplier's liability (Ohio Rev. Code §2307.78).  The complaint also includes causes of action based on the common law of product liability asserted against Sunbeam and Simatelex, including: the sixth cause of action for breach of the implied warranties of merchantability and fitness for use; the seventh cause of action for breach of the express warranties that the product was free from defects in workmanship and materials; the eighth cause of action asserting a claim of common law product liability; and the ninth cause of action for strict product liability.  The thirteenth cause of action asserts a claim for breach of implied or express contract against Wal-Mart, alleging that Wal-Mart represented that the hand mixer was not unreasonably dangerous or defective.  The fourteenth cause of action asserts a claim of common law negligence against all defendants.  The tenth cause of action asserts a claim against all defendants for deceptive acts and unconscionable practices in violation of the Ohio Consumer Sales Practices Act ("CSPA"), Ohio Rev. Code §§1345.02 and 1345.03.  The eleventh cause of action asserts a claim for punitive damages against Sunbeam and Simatelex,[1] and the twelfth cause of action asserts a claim on behalf of Mr. Thompson against all defendant for loss of consortium.

---

[1]Although the claim for punitive damages is denominated as a "cause of action" in the complaint, it is not in fact a cause of action. See Hitchings v. Weese, 77 Ohio St.3d 390, 391, 674 N.E.2d 688 (1997)(in Ohio, no civil cause of action may be maintained simply for punitive damages).  Rather, punitive damages are awarded as an incident of the cause of action in which they are sought, and are simply a remedy for other claims.  Moskovitz v. Mt. Sinai Med. Ctr., 69 Ohio St.3d 638, 650, 635 N.E.2d 331 (1994).  Thus, if plaintiffs' substantive claims do not survive, the remedy of punitive damages is unavailable as well.

I. Background

Barbara Thompson purchased a Sunbeam Mixmaster at Wal-Mart on October 10, 2007. Thompson Dep. p. 11. She was familiar with electric hand mixers and had owned a Black & Decker mixer for about twenty years before purchasing the Sunbeam mixer. Thompson Dep. pp. 11-12. She removed the mixer from the box to test it to make sure it worked. Thompson Dep. p. 17. The box included an instruction booklet, which included the language "IMPORTANT SAFEGUARDS" in enlarged capital letters at the top of the page, and the language "READ ALL INSTRUCTIONS BEFORE USE" in slightly smaller capital letters. Under the "important safeguards" section was a bullet point stating "Unplug from outlet while not in use, before putting on or taking off parts and before cleaning." Another bullet point in that section stated, "Avoid contact with moving parts. Keep hands, hair, clothing, as well as spatulas and other utensils away from beaters during operation to reduce the risk of injury to persons and/or damage to the hand mixer." The next page of the instruction booklet included a section in enlarged capital letters on "INSTALLING ATTACHMENTS." Under this heading, the manual stated,

> Make sure the speed control is in the "OFF" position and unplugged from an electrical outlet. Insert attachments one at a time by placing stem end into the opening on the bottom of the mixer. Turn attachment slightly and push in until it clicks into position. (*See Figure A*) Plug into the appropriate outlet. Turn mixer on and adjust speed setting using the control on the top of the unit.

The manual also contained a section in enlarged capital letters entitled "EJECTING BEATERS." This section stated, "Make sure the speed control is in the 'OFF' position and unplugged from an electrical outlet" prior to ejecting beaters." The bottom of the

3

white mixer body also contained the following language, albeit barely legible, in white lettering: "Caution: Unplug before inserting or removing parts." Lawrence Dubois Dep. pp. 11-12, 49; Richard Prins Dep. p. 51.

Mrs. Thompson stated that she "browsed through" the instruction booklet, looking it over but "not word for word." Thompson Dep. p. 16. When asked if she read the "important safeguards" section, she stated she "looked it over, but I didn't go word for word; skimmed or whatever." Thompson Dep. p. 16. She did not review the entire manual. Thompson Dep. p. 18. She inserted the beaters and pushed them until they clicked. Thompson Dep. p. 19. When she plugged in the mixer, it came on automatically. Thompson Dep. p. 19. She thought she had looked at the switch before plugging in the mixer, but it was possible that she didn't. Thompson Dep. p. 18. She stated she did not know if the switch was in the "on" position, or, if it was, how it got in that position. Thompson Dep. p. 19. She also had no evidence that the control mechanism or switch malfunctioned in any way. Thompson Dep. p. 20. Mrs. Thompson stated that one of the beaters started to come down. She stated she had no knowledge as to whether the locking mechanism for the beaters was malfunctioning. Thompson Dep. p. 25. She stated that she "went like that to push it up (indicating). I didn't think. I just – it was just a reflex, you know. I just automatic [sic] went up there, wasn't thinking." At that point, her finger got caught in the beaters and was almost completely severed. Thompson Dep. p. 17.

Mrs. Thompson testified that at the time, she was holding the mixer's handle with her right hand in the air. One of the beaters was not fully seated and she moved to put it back in with her left

4

hand while the power was on and the other beater was still turning. Thompson Dep. pp. 21-22. When asked why she did that, she stated, "It was just a reflex. I don't know. I just - just did it without thinking." Thompson Dep. p. 22. She was asked whether the language in the manual that said "avoid contact with moving parts" would suggest to her that one should not put his or her hand on a moving part, she responded, "But I wasn't thinking." Thompson Dep. p. 25.

Mrs. Thompson acknowledged that the instruction booklet included a direction to make sure the speed control is in the "off" position and unplugged from and electrical outlet. Thompson Dep. pp. 26-27. She did not know if she checked to make sure that the speed control was in the "off" position before inserting the beaters, and she did not recall whether she turned the beater slightly, as instructed. Thompson Dep. p. 27. She did not look at the warning language that was imprinted on the body of the mixer. Thompson Dep. p. 27-28.

Mrs. Thompson's ring finger was pulled into the two beaters. Thompson Dep. p. 28. She tried unsuccessfully to turn the mixer off and finally placed it on the counter and unplugged it. Thompson Dep. p. 28. Her finger was lodged in between the beaters and was still attached on one edge. Thompson Dep. p. 29. She also sustained cuts on the underside of her third and fifth fingers. Thompson Dep. p. 30. She called to her husband for assistance, and she was taken to the hospital. Thompson Dep. p. 30-31. Her finger was later amputated in the knuckle area.

Richard J. Prins, a senior director product safety engineer employed by Sunbeam, testified concerning the hand mixer. He has been employed by Sunbeam since 1980. Prins Dep. p. 8. The mixer

purchased by Mrs. Thompson has a UL listing mark on it that indicated that the product was UL approved. Prins Dep. p. 11. Prins was previously employed by Underwriters Laboratories ("UL"), a business which generates safety standards for products and tests products for compliance with those standards. Prins Dep. p. 10. Products bearing the UL mark must submit the product to UL for testing, and the product must be manufactured in accordance with the submitted product specifications. Prins Dep. p. 11. UL also conducts four unannounced inspections of the manufacturing facility to make sure that the product is still in compliance, and completes additional testing of samples of the product once a year. Prins Dep. p. 11.

The mixer purchased by Mrs. Thompson was the Sunbeam Mixmaster model 2524, which was manufactured and designed by Simatelex, a Chinese corporation. Prins Dep. pp. 12-13. After a mixer design is submitted to Sunbeam and approved by Sunbeam's marketing department, the design is submitted to the engineering department to start a product specification. Prins Dep. pp. 14, 22. The design goes through a qualification process, which includes a third-party testing by UL. Prins Dep. p. 23. UL tests the design to its standards. The design goes through an engineering build in a pre-pilot manufacturing and production area, and must meet certain quality criteria established by the engineering department. Prins Dep. pp. 23-24. The mixer is also subjected to life testing (long continuous operation) and heavy load testing. Prins Dep. pp. 63-64. When the mixer is in production at Simatelex, Sunbeam's quality organization in Hong Kong goes to the plant, verifies that the manufacturer performed required tests, and randomly picks samples to make sure that the mixers are properly packaged and

operate properly.  Prins Dep. pp. 24-26.  The mixers usually have their switches in the "off" position when packaged, but the user could inadvertently hit the switch while using the handle to remove the mixer from the package.  Prins Dep. p. 54.  Prins had received no reports from quality assurance that the user manual was not found in the sample boxes.  Prins Dep. p. 36.

Sunbeam's engineering, marketing and legal departments were involved in authoring the instruction manual for the mixer.  The "important safeguards" section of the manual, in black text, was written to comply with the UL 982 standard for electric household food preparing equipment.  Prins Dep. p. 37; Dubois Dep. p. 13.  A manufacturer is permitted to add language to the UL minimum required language, but the additional language must be approved by UL.  Prins Dep. pp. 37, 41.  The warnings included with the Sunbeam Mixmaster met industry standards.  Prins Dep. p. 75.

Prins had seen no reports on the mixer from the Consumer Product Safety Commission, which investigates reports of injury.  Prins Dep. p. 48.  He was unaware of any other cases of injuries from the use of this particular hand mixer, and was aware of one other report of a finger injury from the use of another mixer with a broken part.[2]  Prins Dep. pp. 48-49, 58-61.  Prins stated that he did not believe that there was an increased risk of wearing jewelry or rings while operating the mixer because the warnings instructed the user to avoid contact with moving parts and to keep hands, hair, clothing and utensils away from the beaters.  Prins Dep. p.

---

[2]This court's computer research through the federal and state directories likewise disclosed only one reported product liability case involving a kitchen mixer.  See Burke v. Hamilton Beach Div., Scovill Mfg. Co., 424 A.2d 145 (Me. 1981).  In that case, a safety mechanism on a twenty-year-old mixer failed and allowed the beaters to turn while the plaintiff was inserting them.

51-52. Prins was unaware of any safety standards for kitchen equipment which advised against wearing jewelry during operation, although he had seen it in the industrial or manufacturing context where jewelry could accidently catch on operator buttons, thereby inadvertently actuating the manufacturing machine. Prins Dep. pp. 55-56. Prins had seen no technical bulletins or recall notices regarding the mixer. Prins Dep. pp. 64-65. He testified that placing a guard around the outside of the beaters to protect against injury would also prevent food mixing. Prins Dep. p. 65-66. He was unaware of any mechanical device which would reduce the risk of injury without compromising the utility of the mixer. Prins Dep. p. 75.

Lawrence Dubois, an engineer and manager of the materials and product testing department at CTL Engineering for thirty years, was retained by Sunbeam to examine the hand mixer involved in this case. In his report dated November 29, 2010, Doc. 37-6, DuBois stated that the mixer operated properly and functioned as designed. The on/off switch operated normally, no damage to the mixer was noted, the motor and beaters operated as expected, the eject button operated properly, and the engagement of the beaters was secure when they were properly installed, as evidenced by a clicking sound. He found no evidence of any malfunctions or manufacturing or design defects in the mixer. He could not say whether there was a pinch point on the mixer, since he did not evaluate the mixer to determine if there was a pinch point. DuBois Dep. pp. 36-37. A pinch point occurs where at least one movable component in the machinery comes into close proximity or direct contact with another component of the machinery. Dubois Dep. p. 25. DuBois saw no evidence on the beaters that they had come into contact with a hard

8

object such as a ring.  Since the photograph of the rings did not show any damage to the ring, DuBois had trouble "understanding how the beaters would catch a ring and pull the ring finger into the beaters[.]"  DuBois Dep. p. 47.  He was also unaware of any injuries to the ring side of the hand which would be consistent with the ring pulling the hand into the beaters and causing injury to the area around the ring.  DuBois Dep. p. 48.

DuBois also reviewed the user's manual, noting the instruction to avoid contact with moving parts, to keep hands, hair, clothing and utensils away from the beaters during operation and to unplug the mixer before putting on or taking off parts.  He concluded from Mrs. Thompson's deposition testimony that she violated these warnings when she attempted to push a loose beater back into the mixer with her hand while it was operating, and that she failed to properly insert the beaters.

DuBois stated that additional warnings concerning wearing jewelry would not have prevented Mrs. Thompson's injury, because she testified that placing her hand against the moving beaters was reactionary.  Dubois stated in his report, "Warnings do not protect against such reactions."  DuBois also noted that it would be unrealistic to construct the mixer so as not to expose moving parts, because "exposed moving parts are an inherent necessity in the operation of a hand mixer for its intended use and are permitted by UL 982."  He stated that he was only aware of a prohibition against wearing jewelry around machinery in one instance involving a piece of manufacturing equipment.  DuBois Dep. pp. 26-27.

Plaintiffs retained Lewis Barbe, a safety engineer with Occupational Safety and Health Services, as an expert witness.  In

9

his report, Doc. 39-2, Barbe concluded that the instructions provided with the mixer were inadequate in that they did not specifically warn against wearing jewelry around the moving parts. Barbe also concluded in his report that the mixer was defective because Sunbeam failed to construct a mixer without exposed moving parts.  However, he stated in his deposition that he was not criticizing the mixer for having exposed moving parts, and that he was not offering an opinion concerning whether the mixer had a manufacturing or design defect.  Barbe Dep. pp. 34, 63.  Barbe concluded that the defects in the warnings were the proximate cause of Mrs. Thompson's injuries.

Mr. Barbe testified at his deposition that he did not examine the actual mixer at issue in this case and did not test the mixer. Barbe Dep. pp. 28-31.  He did not know which beater fell out, and did not know in which direction the beaters rotated.  Barbe Dep. p. 33.  Mr. Barbe was unaware of any other cases where a person was injured wearing jewelry while operating a Sunbeam mixer.  Barbe Dep. p. 39.  He opined that the statements in the instruction manual were not warnings because they did not include some signal such as the word "danger," lettering in a different color, or an exclamation point.  Barbe Dep. pp. 42-45, 66.

II. Motion for Summary Judgment

A. Summary Judgment Standards

Defendants have moved for summary judgment on all of plaintiffs' claims.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

10

Fed. R. Civ. P. 56(a).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, by showing that the materials cited do not establish the absence or presence of a genuine dispute, or by demonstrating that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) and (B).  In considering a motion for summary judgment, this court must draw all reasonable inferences and view all evidence in favor of the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Am. Express Travel Related Servs. Co. v. Kentucky, 641 F.3d 685, 688 (6th Cir. 2011).

The moving party has the burden of proving the absence of a genuine dispute and its entitlement to summary judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party's burden of showing the lack of a genuine dispute can be discharged by showing that the nonmoving party has failed to establish an essential element of his case, for which it bears the ultimate burden of proof at trial.  Id.  Once the moving party meets its initial burden, the nonmovant must set forth specific facts showing that there is a genuine dispute for trial.  Id. at 322 n. 3.  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." Niemi v. NHK Spring Co., Ltd., 543 F.3d 294, 298 (6th Cir. 2008).  A fact is "material" only when it might affect

11

the outcome of the suit under the governing law.  Id; Anderson, 477 U.S. at 248.

The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts[.]" Matsuchita, 475 U.S. at 586.  A mere scintilla of evidence is not enough. Anderson, 477 U.S. at 252; Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir. 2006).  Further, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  See Fed. R. Civ. P. 56(c)(3)(noting that the court "need consider only the cited materials").

Because jurisdiction is based on diversity, the substantive law of the forum state applies.  Anton v. National Union Fire Ins. Co. of Pittsburgh, Pa., 634 F.3d 364, 367 (6th Cir. 2011).  The parties do not dispute that the law of Ohio governs plaintiffs' claims.  This court must apply the state law in accordance with the decisions of the highest state court.  Ventura v. The Cincinnati Enquirer, 396 F.3d 784, 792 (6th Cir. 2005).  If the Ohio Supreme Court has not directly addressed an issue, this court "must ascertain from all available data, including the decisional law of the state's lower courts, what the state's highest court would decide if faced with the issue." Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 517 (6th Cir. 2001).

In their memorandum contra defendants' motion for summary judgment, plaintiffs focus their arguments primarily on the adequacy of the warnings provided with the mixer.  They do not address many of the arguments made by defendants and thus may be deemed to have conceded those claims.  Nonetheless, the court will

12

address all of plaintiffs' claims in deciding the motion.  The
court will also assume, for purposes of deciding the motion for
summary judgment, that Lewis Barbe is qualified as an expert.

B. Defective Manufacture and Construction

    Under Ohio Rev. Code §2307.73(A), a manufacturer is subject to
liability based on a product liability claim only if the plaintiff
establishes by a preponderance of the evidence that a product
designed, formulated, produced, constructed, created or assembled
by the manufacturer was defective in manufacture or construction
(§2307.57), was defective in design or formulation (§2307.75), was
defective due to inadequate warning or instruction (§2307.76), or
was defective because it did not conform to a representation made
by the manufacturer (§2307.77) and that the defective aspect of the
product was the proximate cause of harm to the plaintiff.  A
"manufacturer" is "a person engaged in a business to design,
formulate, produce, create, make, construct, assemble, or rebuild
a product or a component of a product."  Ohio Rev. Code
§2307.71(9).

    In the first cause of action, plaintiffs allege that Mrs.
Thompson was injured due to the defective manufacture or
construction of the mixer by Sunbeam and Simatelex.  "A product is
defective in manufacture or construction if, when it left the
control of its manufacturer, it deviated in a material way from the
design specifications, formula, or performance standards of the
manufacturer, or from otherwise identical units manufactured to the
same design specifications, formula, or performance standards."
§2307.74.  DuBois' report and deposition indicate that the mixer
worked properly, and that he found no sign of damage, defective
manufacture or defective construction.  No evidence of defective

13

manufacture or construction was presented in this case, and Sunbeam and Simatelex are entitled to summary judgment on this claim.  See Becton v. Starbucks Corp., 491 F.Supp.2d 737, 748-49 (S.D.Ohio 2007)(granting summary judgment on manufacturing defect claim where plaintiff failed to present evidence showing that his injuries were caused by a manufacturing defect and not by other possibilities, such as his own negligence).

C. Defective Design or Formulation

In the second cause of action, plaintiffs allege that Sunbeam and Simatelex are liable due to defects in the design or formulation of the mixer.  A product is defective in design or formulation "if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation ... exceeded the benefits associated with that design or formulation[.]"  Ohio Rev. Code §2307.75(A).

Factors to be considered in determining foreseeable risks include: (1) the nature and magnitude of the risks of harm associated with the design or formulation in light of the intended and reasonably foreseeable uses of the product; (2) the likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm; (3) the likelihood that the design or formulation would cause harm in light of the intended and reasonably foreseeable uses of the product; (4) the extent to which the design or formulation conformed to any applicable public or private product standard; and (5) the extent to which the design or formulation is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.  Ohio Rev. Code §2307.75(B).

Factors to consider in determining the benefits associated

14

with the design or formulation include: (1) the intended or actual utility of the product, including any performance or safety advantages associated with the design or formulation; (2) the technical and economic feasibility of using an alternative design or formulation; and (3) the nature and magnitude of any foreseeable risks associated with an alternative design or formulation. Ohio Rev. Code §2307.75(C). The OPLA further provides:

> (E) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantial compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

> (F) A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensator damages without substantial impairing the usefulness or intended purpose of the product.

Ohio Rev. Code §2307.75(E) and (F); Kerg v. Atlantic Tool and Die Co., 176 Ohio App.3d 437, 449-450, 892 N.E.2d 481 (2008). The mere fact that a product may or did cause injury does not mean that the product is defective based on its design. Bouher v. Aramark Services, Inc., 181 Ohio App.3d 599, 603, 910 N.E.2d 40 (2009).

In his report, DuBois states that he found no evidence of design defects in the mixer. There is obviously a risk of harm involved in placing body parts in close proximity to rapidly turning beaters. However, the risk posed by placing body parts, clothing or other objects near the beaters would be obvious to the user of the mixer, particularly experienced users such as Mrs.

Thompson, based on general knowledge and the instructions which accompanied the mixer, which specifically warned users to "[a]void contact with moving parts. Keep hands, hair, clothing, as well as spatulas and other utensils away from beaters during operation to reduce the risk of injury to persons and/or damage to the hand mixer." If this cautionary instruction is heeded, the mixer is safe to use for its intended function, witness the fact that neither party has cited any product liability cases involving household kitchen mixers. There is also evidence that the mixer and the instruction booklet accompanying the mixer were UL approved. Compliance with such industry safety standards "is a compelling factor." Vermett v. Fred Christen & Sons Co., 138 Ohio App.3d 586, 609, 741 N.E.2d 954 (2000).

There is no evidence of any feasible alternative design which would have shielded the beaters. DuBois stated in his report that "exposed moving parts are an inherent necessity in the operation of a hand mixer for its intended use and are permitted by UL 982." Prins testified that placing a guard around the outside of the beaters to protect against injury would also prevent food mixing, and that he was unaware of any mechanical device which would reduce the risk of injury without compromising the utility of the mixer. Prins Dep. pp. 65-66, 75. See Jacobs v. E.I. Du Pont de Nemours & Co., 67 F.3d 1219, 1242 (6th Cir. 1995)(upholding summary judgment on defective design claim where plaintiffs offered no evidence that there was an alternative design that would have avoided plaintiffs' injuries without undermining the efficacy of the products).

The evidence establishes that the harm caused to Mrs. Thompson was due to an inherent characteristic of the mixer which is a generic aspect of the product that cannot be eliminated without

16

substantially compromising the product's usefulness.  The risk of getting her ring finger close to the beaters would have been recognized by an ordinary person with ordinary knowledge common to the community as presenting the risk of getting one's finger caught in the beaters.  There was no evidence that a practical and technically feasible alternative design was available that would have prevented the injury to Mrs. Thompson without substantially impairing the usefulness or intended purpose of the product.

Plaintiffs have failed to produce expert or other evidence sufficient to demonstrate that the mixer's design was defective in any way within the meaning of §2307.75.  See Becton, 491 F.Supp.2d at 749 (granting summary judgment on defective design claim); Gumnitsky v. Delta International Machinery Corp., 411 F.Supp.2d 756, 762 (N.D.Ohio 2005)(summary judgment granted on defective design claim where plaintiff presented no expert analysis or other evidence demonstrating that some aspect of the design was defective).  No genuine dispute has been shown to exist in regard to the claim of defective design or formulation, and Sunbeam and Simatelex are entitled to summary judgment on this claim.

D. Defects Due to Inadequate Warning or Instruction

In the third cause of action, plaintiffs assert claims against Sunbeam and Simatelex alleging that the mixer was defective due to inadequate warning or instruction.  A product is defective due to inadequate warning or instruction if, when it left the control of the manufacturer, (1) the manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages, and (2) the manufacturer failed to provide the warning or instruction that a

17

manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm. Ohio Rev. Code §2307.76(A)(1)(a) and (b). The statute further provides that a product "is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge. Ohio Rev. Code §2307.76(B).

A warning is adequate if it reasonably discloses all inherent risks and if the product is safe when used as directed. Boyd v. Lincoln Electric Co., 179 Ohio App.3d 559, 569, 902 N.E.2d 1023 (2008). Where the injury would not have occurred if the warnings had been followed, the content of the warning was adequate. Phan v. Presrite Corp., 100 Ohio App.3d 195, 200, 653 N.E.2d 708 (1994). However, warnings may be found inadequate not only based on their content, but also on their form, manner of expression, or lack of exigency. Boyd, 179 Ohio App.3d at 569.

The instruction booklet in this case included the language "IMPORTANT SAFEGUARDS" in enlarged capital letters at the top of the page, and the language "READ ALL INSTRUCTIONS BEFORE USE" in slightly smaller capital letters. Under the "IMPORTANT SAFEGUARDS" section was a bullet point stating "Unplug from outlet while not in use, before putting on or taking off parts and before cleaning." Another bullet point in that section stated, "Avoid contact with moving parts. Keep hands, hair, clothing, as well as spatulas and other utensils away from beaters during operation to reduce the risk of injury to persons and/or damage to the hand mixer." The

18

next page of the instruction booklet included a section in enlarged capital letters on "INSTALLING ATTACHMENTS." Under this heading, the manual stated,

> Make sure the speed control is in the "OFF" position and unplugged from an electrical outlet. Insert attachments one at a time by placing stem end into the opening on the bottom of the mixer. Turn attachment slightly and push in until it clicks into position. (*See Figure A*) Plug into the appropriate outlet. Turn mixer on and adjust speed setting using the control on the top of the unit.

The manual also contained a section in enlarged capital letters entitled "EJECTING BEATERS." This section stated, "Make sure the speed control is in the 'OFF' position and unplugged from an electrical outlet" prior to ejecting beaters." The bottom of the white mixer body also contained the following language, albeit barely legible, in white lettering: "Caution: Unplug before inserting or removing parts."

This language clearly informs users to keep body parts and other objects clear of the moving beaters, and to unplug the mixer before inserting the beaters. Plaintiffs' expert, Lewis Barbe, took issue with the fact that this language was not preceded by a signal word such as "danger" in another color. However, these statements are more than mere instructions. The words "IMPORTANT SAFEGUARDS" appear conspicuously at the top of the page in large print. A "safeguard" guards against something that is not safe. This word is the literal equivalent of "danger." In addition, the user is instructed to keep body parts and clothing away from the beaters during operation "to reduce the risk of injury to persons[.]"

Barbe also objected to the warnings on the ground that they did not specifically advise the user to remove jewelry such as

19

rings prior to operating the mixer.  The court notes that although plaintiffs allege that the injury was the result of Mrs. Thompson's ring being caught in the beaters, Mrs. Thompson never testified that the moving beater hit her ring.  The record includes what purports to be an unauthenticated emergency room report, in which it is stated that Mrs. Thompson caught her ring finger in "some sort of blender mechanism" and that "it looks like it caught her rings and created an almost total amputation of the left 4th finger, that is malrotated."  The Sixth Circuit has held that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" Wiley v. United States, 20 F.3d 222, 226 (6th Cir. 1994)(quoting Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988)).  Unauthenticated exhibits are not proper evidence for opposing or supporting a summary judgment motion.  Steele v. Jennings, No. 2:04-cv-189, 2005 WL 2124152 at *3 (S.D. Ohio Aug. 31, 2005).  The report also includes hearsay evidence may not be considered on a motion for summary judgment.  Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 927 (6th Cir. 1999).  The record does not include any expert medical testimony concerning the exact nature or cause of the injury to Mrs. Thompson's finger.  Because there is no competent evidence in the record that the ring contributed to her injury, Barbe's testimony regarding the necessity of warning against wearing a ring is irrelevant.

Even assuming that the ring did contribute to or exacerbate plaintiff's injury, the that fact that the warnings did not specifically advise users to remove their rings did not render the warnings inadequate.  The warnings did specifically mention

"clothing," and a ring is worn on the body, as are articles of clothing. Defendants were not required to include in the warnings an exhaustive list of the specific types of clothing, jewelry, or other articles which might come into contact with the beaters. The language instructed users to keep their hands away from the moving parts. Plaintiffs' expert, Lewis Barbe, did not explain why the warning about keeping one's hands away from the beater was not adequate to prevent injury from wearing a ring. Even Barbe agreed that if the user followed the instruction to keep his or her hands away from the beaters during operation, the user's hand would not be caught in the beaters and the user would not be injured. Barbe Dep. pp. 46-47. He also agreed that the beaters would never take a person's finger off because of the person was wearing a ring if the user's hand never comes into contact with the moving part. Barbe Dep. p. 67. See Phan, 100 Ohio App.3d at 200 (content of warning was adequate where all experts agreed that accident would not have occurred if warning label had been followed). Thus, Barbe's opinion in regard to the need for a specific warning about wearing rings is insufficient to create a genuine dispute.

Defendants have presented evidence that the "important safeguards" section of the manual, in black text, was written to comply with the UL 982 standard for electric household food preparing equipment. Prins Dep. p. 37; Dubois Dep. p. 13. A manufacturer is permitted to add language to the UL minimum required language, but the additional language must be approved by UL. Prins Dep. pp. 37, 41. The warnings included with the Sunbeam Mixmaster met industry standards. Prins Dep. p. 75. No reasonable trier of fact would find that the warnings in the manual were inadequate in their manner of presentation or by reason of the

failure to specifically warn against wearing jewelry, nor could a jury find that the wearing of a ring played any role in causing plaintiff's injury.

Plaintiffs must also show that the lack of proper warnings was the proximate case of the injury to Mrs. Thompson.  In Ohio, there is a presumption that an adequate warning, if given, will be read and heeded.  Freas v. Prater Construction Corp., Inc., 60 Ohio St.3d 6, 9, 573 N.E.2d 27 (1991); Boyd, 179 Ohio App.3d at 571.  Here, Mrs. Thompson testified that she "browsed through" the instruction booklet, looking it over but "not word for word."  Thompson Dep. p. 16.   When asked if she read the "important safeguards" section, she stated she "looked it over, but I didn't go word for word; skimmed or whatever."  Thompson Dep. p. 16.  She did not review the entire manual.  Thompson Dep. p. 18.  See Phan, 100 Ohio App.3d at 201 (plaintiff failed to establish that alleged inadequacy of the warning was the proximate cause of plaintiff's injuries where plaintiff did not read the warning).

Assuming that Mrs. Thompson read the relevant portions of the manual, those statements contained adequate warnings about keeping hands and clothing away from the beaters during operation of the mixer.  Mrs. Thompson should then have been aware of the danger of getting her hand, on which the ring was located, close enough to the moving beaters for the ring to get caught.  See Freas, 60 Ohio St.3d at 10 (finding that the lack of additional warnings did not cause worker's death where the worker had read the manual and knew the dangers of standing under the boom of the crane).  Here, defendants argue that Mrs. Thompson's injury was caused by her own inattention.   Mrs. Thompson grabbed the ejected beater and attempted to re-insert it while the mixer was still running.  When

22

asked why she did that, she stated, "It was just a reflex. I don't know. I just – just did it without thinking." Thompson Dep. p. 22. She stated, "I didn't think. I just – it was just a reflex, you know. I just automatic [sic] went up there, wasn't thinking." Thompson Dep. p. 17. She even testified that she had previously adjusted beaters on an electric mixer before while it was operating, stating, "My older mixer would sometimes drop down, and I would push it up, too, just without thinking." Thompson Dep. p. 28. DuBois noted in his report that

> it is illogical that warning against wearing rings ... while operating the mixer in addition to the existing warnings would have prevented her injury. She testified that placing her hand against the moving beaters was reactionary. Warnings do not protect against such reactions.

No trier of fact could reasonably find that any warnings more specific than those given in the manual, specifically, to keep hands and clothing away from the beaters while the mixer was operating, would have forestalled Mrs. Thompson's ingrained reflexive reaction.

Defendants also argue that the mixer was not defective due to the alleged lack of adequate warnings because the alleged failure to warn concerned "an open and obvious risk or a risk that is a matter of common knowledge." §2307.76(B); Hanlon v. Lane, 98 Ohio App.3d 148, 152-54, 648 N.E.2d 26 (1994)(dangers of improperly vented gas furnace and carbon monoxide poisoning were open and obvious); Gawloski v. Miller Brewing Co., 96 Ohio App.3d 160, 163, 644 N.E.2d 731 (1994)(dangers of excessive or prolonged use of alcoholic beverages was a matter of common knowledge in the community and generally know and recognized by the ordinary consumer); Pfaff v. Benjamin Air Rifle Co., No. 71998 (8th Dist.),

23

1997 WL 764761 (Ohio App. Dec. 11, 1997)(being shot in the eye by a paint gun was an obvious risk).  In considering whether a product presents an open and obvious risk, it is necessary to determine whether the particular hazard giving rise to the subject injury was obvious or commonly known.  Lykins v. Fun Spot Trampolines, 172 Ohio App.3d 226, 232, 874 N.E.2d 811 (2007).  "It is not the severity of the specific injury that constitutes the open and obvious risk; the open and obvious risk is the 'danger or potentiality for danger' that a product possesses, regardless of the innumerable degrees of severity of injury which might occur."  Bouher, 181 Ohio App.3d at 604 (quoting Nadel v. Burger King Corp., 119 Ohio App.3d 578, 592, 695 N.E.2d 1185 (1997)(Hildebrandt, J., concurring in part and dissenting in part)).

In this case, the hazard was created by Mrs. Thompson bringing her hand into close proximity with the moving beaters, which caused her ring finger to be pulled into the two beaters.  Thompson Dep. p. 28.  The risk of injury from placing one's hands near rapidly turning beaters is an open and obvious risk or a risk that is a matter of common knowledge.

No genuine dispute has been shown to exist in regard to plaintiffs' claim of inadequate warnings, and Sunbeam and Simatelex are entitled to summary judgment on this claim.

E. Nonconformance with Manufacturers' Representations

In their fourth cause of action against Sunbeam and Simatelex, plaintiffs allege that the mixer was defective due to nonconformance with manufacturers' representations.  "A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer."  §2307.77.  This statute, by its terms, applies to express

24

warranties.  Plaintiffs argue that the failure to include adequate warnings for the safe operation of the mixer breached the warranty of fitness of this product.  Aside from the fact that plaintiffs have failed to show that the mixer was defective due to the lack of proper warnings, the common law claim of breach of the implied warranties of merchantability and fitness for a particular purpose against manufacturer and supplier were expressly abrogated by an amendment to the OPLA, effective April 7, 2005.  See Ohio Rev. Code §2307.71(B)(stating that §§2307.71 to 2307.80 "are intended to abrogate all common law product liability claims or causes of action."); <u>Miles v. Raymond Corp.</u>, 612 F.Supp.2d 913, 917-924 (N.D.Ohio 2009)(common law product liability claims of breach of implied warranties were abrogated by the OPLA.); <u>Luthman v. Minster Supply co.</u>, No. 2-06-43 (3rd Dist.), 2008 WL 169999 at *7 (Ohio App. Jan. 22, 2008)(OPLA has preempted the implied warranties of merchantability and fitness for a particular purpose)(citing <u>Nadel</u>, 119 Ohio App.3d at 585).

There is no evidence that Sunbeam or Simatelex breached any express warranty to plaintiffs.  No evidence of any express warranties which may have been made in connection with the sale of the mixer is included in the record.  Sunbeam and Simatelex are entitled to summary judgment on this claim.

<u>F. Liability of Wal-Mart as a Supplier</u>

Plaintiffs allege in their fifth cause of action that Wal-Mart is liable as a supplier of the hand mixer.  Wal-Mart's potential liability is governed by Ohio Rev. Code §2307.78.  That section provides that a supplier is liable only if:

> (1) The supplier in question was negligent and that[] negligence was the proximate cause of harm for which the claimant seeks to recover compensatory damages;

> (2) The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages.  A supplier is subject to liability for such a representation and the failure to conform to it even though the supplier did not act fraudulently, recklessly, or negligently in making the representation.

§2307.78(A)(1) and (2); <u>Doane v. Givaudan Flavors Corp.</u>, 184 Ohio App.3d 26, 34, 919 N.E.2d 290 (2009).

To prove negligence, plaintiffs must show that Wal-Mart owed them a duty, that Wal-Mart breached that duty, and that the breach proximately caused injury to the plaintiffs.  <u>Menifee v. Ohio Welding Products, Inc.</u>, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984).  There is no evidence of any negligent act on the part of Wal-Mart so as to support liability under §2307.78(A)(1).  There is no evidence that Wal-Mart did anything other than sell the hand mixer to Mrs. Thompson.  Defendants have submitted the affidavit of Cindy Hay, Wal-Mart's Senior Manager for Home Strategy.  Doc. 37-4.  Hay states in her affidavit that Wal-Mart was strictly the retailer of the mixer.  Hay Aff. ¶ 5.  Wal-Mart was not the manufacturer of the mixer, did not design the mixer, did not alter or modify the mixer, made no representations regarding the mixer's use or performance, did not prepare or offer any warnings separate and apart from those issued by the manufacturer, and made no express or implied warranties about the mixer.  Hay Aff. ¶¶4, 6-10.  Wal-Mart had no knowledge or notice of any defects relative to the mixer prior to the filing of this action.  Hay Aff. ¶ 11.

Under the OPLA, Wal-Mart, as a supplier, can be held derivatively liable for any negligent acts of the defendant

manufacturers, such as a defect in manufacture or design or the sufficiency of the instructions or warnings, only if the manufacturers are not subject to judicial process in the state or are insolvent, or if Wal-Mart owns or is owned by a manufacturer, created or furnished the design or formulation for the product to the manufacturer, altered, modified or failed to maintain the product, marketed the product under its own label, or failed to timely respond to a written request from the plaintiff to disclose the name and address of the manufacturer of the product. <u>See</u> Ohio Rev. Code §2307.78(B). There is no evidence that any of these circumstances were present in the instant case.

There is also no evidence that Wal-Mart or any of its employees made any representations to Mrs. Thompson when she purchased the hand mixer which would establish liability under §2307.78(A)(2). Mrs. Thompson testified at her deposition that she did not speak to any Wal-Mart employee about the mixer when she purchased it, and that no one at Wal-Mart made any representations to her concerning how the product would function. Thompson Dep. pp. 41-42.

Wal-Mart is entitled to summary judgment on the fifth cause of action.

G. Claims under the CSPA

In the tenth cause of action, plaintiffs have alleged claims against the defendants under the CSPA. The CSPA prohibits suppliers from committing either unfair or deceptive consumer sales practices (as listed in §1345.02) or unconscionable acts or practices (as described in §1345.03). "In general, the CSPA defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are

27

receiving, while 'unconscionable acts or practices' relate to a
supplier manipulating a consumer's understanding of the nature of
the transaction at issue." <u>Johnson v. Microsoft Corp.</u>, 106 Ohio
St.3d 278, 287, 834 N.E.2d 791 (2005).  The CSPA applies to
consumer transactions, including the sale of an item of goods to an
individual for purposes that are primarily personal, family, or
household.  <u>See</u> Ohio Rev. Code §1345.01(A).  Plaintiffs do not
address defendants' arguments concerning the CSPA claims in their
memorandum contra defendants' motion for summary judgment on these
claims.  There is no evidence in the record that defendants engaged
in any unfair or deceptive act or practice, as described in Section
1345.02(A), or any unconscionable act or practice as described in
Section 1345.03(A).  Defendants are entitled to summary judgment on
plaintiffs' claims under the CSPA.

<u>H. Common Law Product Liability Claims</u>

Defendants argue that the common law product liability claims
asserted in causes of action six through nine, thirteen and
fourteen, are product liability claims within the meaning of Ohio
Rev. Code §2307.71(13) and are preempted by the OPLA.  The OPLA was
amended effective April 7, 2005, to state that §§2307.71 to 2307.80
"are intended to abrogate all common law product liability claims
or causes of action."  Ohio Rev. Code §2307.71(B).  In uncodified
commentary contained in 2004 S.B. 80, the General Assembly stated
in regard to §2307.71(B) that  it was "intended to supersede the
holding of the Ohio Supreme Court in <u>Carrel v. Allied Prods. Corp.</u>
(1997), 78 Ohio St.3d 284, that the common-law product liability
cause of action of negligent design survives the enactment of the
Ohio Product Liability Act, sections 2307.71 to 2307.80 of the
Revised Code, and to abrogate all common law product liability

28

causes of action."

Courts which have addressed the issue have concluded that the OPLA preempts common law product liability claims. See Hale v. Enerco Group, Inc., No. 1:10-CV-867-DAP, 2011 WL 49545 at *7 (N.D. Ohio 2011); Mitchell v. Proctor & Gamble, No. 2:09-cv-426, 2010 WL 728222 at **2-4 (S.D.Ohio March 1, 2010) Moeller v. Auglaize Erie Machine Co., No. 2-08-10 (3rd Dist.), 2009 WL 161784 at *6 (Ohio App. Jan. 26, 2009); Miles, 612 F.Supp.2d at 917-924; Stratford v. SmithKline Beecham Corp., No. 2:07-CV-639, 2008 WL 2491965 at *7 (S.D. Ohio June 17, 2008) Routzahn v. Garrison, No. 21190 (2nd Dist.), 2006 WL 1984498 at *10 (Ohio App. July 14, 2006).

Plaintiffs' sixth cause of action, breach of implied warranties, and plaintiffs' seventh cause of action, breach of express warranties, fall within the definition of a "product liability claim," which expressly includes "[a]ny failure of [the] product to conform to any relevant representation or warranty." §2307.71(13)(c). These warranty claims are preempted by the OPLA. Miles, 612 F.Supp.2d at 922-924.

Plaintiffs' claim for common law product liability, their eighth cause of action, also alleges acts which are addressed under the OPLA. Defective manufacture and construction are included under §2307.74. Defects in design and formulation are included under §2307.75. Defects due to inadequate warning or instruction are contained in §2307.76. Defects due to nonconformance with a manufacturer's representations are addressed in §2307.77. The eighth cause of action is therefore preempted, as is plaintiffs' ninth cause of action for strict product liability.

In their thirteenth cause of action, plaintiffs allege a claim for breach of express or implied contract against Wal-Mart.

29

Plaintiffs allege that Wal-Mart represented that the hand mixer was not unreasonably dangerous, inherently dangerous or defective.  The fact that this claim is pleaded as a breach of contract claim is not controlling, as under Ohio law, it is the substance of the claim, not the manner in which it is pleaded, that determines how it is treated.  See Lawyers Coop. Publ'g Co. v. Meuthing, 65 Ohio St.3d 273, 277-78, 603 N.E.2d 969 (1992).  The claim asserted in the thirteenth cause of action is encompassed within the OPLA, which states that a supplier is liable if the plaintiff establishes that the product "did not conform, when it left the control of the supplier in question, to a representation made by the supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages."  Ohio Rev. Code §2307.78(A)(2).  Therefore, the thirteenth cause of action is preempted by the OPLA.

Finally, plaintiffs' fourteenth cause of action asserts a claim of negligence, stating that the defendants had a duty to provide a product to consumers that was not unreasonably or inherently dangerous or defective, and that defendants breached this duty.  This cause of action falls within the scope of the OPLA and is preempted.

Even if plaintiffs' common law causes of action are addressed on the merits, defendants are entitled to summary judgment on those claims for the reasons stated above in addressing those same claims under the OPLA.  Defendants are entitled to summary judgment on plaintiffs' causes of action six through nine, thirteen and fourteen.

I. Loss of Consortium

A loss of consortium claim is a derivative claim that can be

30

maintained only if the primary cause of action is proven. <u>Vinicky v. Pristas</u>, 163 Ohio App.3d 508, 513, 839 N.E.2d 88 (2005)(citing <u>Bowen v. Kil-Kare, Inc.</u>, 63 Ohio St.3d 84, 92-93, 585 N.E.2d 384 (1992)).  Since this court has determined that defendants are entitled to summary judgment on all of Mrs. Thompson's substantive claims, defendants are also entitled to summary judgment on the twelfth cause of action, Mr. Thompson's loss of consortium claim.


<u>III. Motion to Exclude Expert Testimony</u>

In light of the court's ruling on the motion for summary judgment, this court need not address defendants' motion <u>in limine</u> and it is denied as moot.


<u>IV. Conclusion</u>

In accordance with the foregoing, defendants' motion <u>in limine</u> (Doc. 39) is denied as moot.  Defendants' motion for summary judgment (Doc. No. 37) is granted.  The clerk is instructed to enter final judgment in favor of the defendants on all of plaintiffs' claims.


Date: September 28, 2011          <u>        s/James L. Graham        </u>
                                  James L. Graham
                                  United States District Judge

31